UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| DENIA HEDGE, individually, and on behalf of others similarly situated, | ) <br> ) <br> ) **CLASS ACTION COMPLAINT** <br> ) <br> ) <br> ) **FLSA COLLECTIVE ACTION** <br> ) **COMPLAINT UNDER** <br> ) **29 USC § 216(b)** <br> ) <br> ) CASE NO.  3:18-CV-00246 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Plaintiff, | |
| vs. | |
| TOYOTA MOTOR MANUFACTURING, INDIANA, INC. and AEROTEK, INC., | |
| Defendants. | |

***PLAINTIFF'S CLASS ACTION AND FLSA COLLECTIVE ACTION COMPLAINT FOR DAMAGES***

Comes now the Plaintiff, Denia Hedge ("Hedge"), individually and on behalf of all others similarly situated, by counsel, and for her Class Action and FLSA Collective Action Complaint for Damages against the Defendants Toyota Motor Manufacturing, Indiana, Inc. ("TMMI") and Aerotek, Inc. ("Aerotek") (collectively "Defendants"), alleges and says:

*I.  STATEMENT OF THE CASE*

Hedge brings this class and collective action lawsuit against Defendants to address class-wide wage and hour violations committed by Defendants against their hourly-paid employees. Hedge also brings claims against Defendants for their class-wide breach of contract.  Hedge will serve as class representative of current and former employees of Defendants who were victims of Defendants' class-wide wage violations and Defendants' class-wide breach of contract.

Defendants utilize numerous policies to avoid paying their employees all earned overtime

1

wages.  For example, Defendants are and have been underpaying their employees' wages on a class-wide basis as a result of a facility-wide policy or scheme in which Defendants fail and refuse to pay employees from their first principal work activity each day until their last principal work activity.  All hourly-paid employees of Defendants were similarly subjected to Defendants' unlawful compensation scheme that required their hourly paid production employees to perform significant work prior to the official scheduled start time of each shift and to perform significant work after the official scheduled end of each shift.  Defendants have not been paying their employees for this additional work time.  Generally, Defendants have not been paying employees for: 1) their time spent in required pre-shift meetings in which employees are required to engage in stretching exercises while they are given Toyota's news of the day; 2) their time spent donning personal protective equipment prior to the beginning of their scheduled shift; or 3) their time spent doffing personal protective equipment after the end of their scheduled shift.  This wage payment scheme is particularly troublesome, because Defendants require their employees to report to work and engage in these work activities significantly before scheduled shift times but also require that these activities be performed "off-the-clock".  Each hourly-paid employee begins his/her work day by obtaining and donning substantial protective gear (called "PPE") and clothing, all of which is required by Defendants (and for safety purposes) and all of which is integral and indispensable to the work performed by each employee.  Each employee also has to engage in work in order to walk to a pre-shift meeting everyday. Each employee also has to engage in work in order to walk from the pre-shift meeting to his/her work station.  The employee is required to be at his/her respective work station and ready to work at his/her scheduled working time and is required to stay at his/her work station until his/her scheduled quitting time. Upon leaving the work station at the scheduled quitting time, each employee must

clock-out. After clocking-out, the employee has to walk back to the employee locker room, doff and put away his/her PPE, clean up and then clock out and leave for the day. Defendants do not pay employees wages or overtime for all of the required work donning and doffing PPE and clothing and walking to and from the locker rooms where this required work is performed.

Defendants also fail to properly calculate the overtime due to their employees. Specifically, Hedge and similarly situated individuals receive performance based, non-discretionary bonuses, shift differentials and wellness credits. However, Defendants fail to include these payments in the calculation of each employee's regular hourly rate, which caused Hedge and other similarly situated employees to receive an overtime rate less than one and one-half times their regular rate.

By way of Defendants' illegal time recording and pay practices, Defendants have been intentionally failing and refusing to pay employees for many minutes per day of required and actual work time. Defendants' refusal to pay for work from the first principal activity (donning) through the last principal work activity (doffing) violates the FLSA and result in underpayment of overtime compensation.

Hedge's collective action claims based upon Defendants' illegal calculation of overtime due and Defendants' failure to pay for all hours worked under the FLSA, from the first principal activity (donning) through the last principal work activity (doffing), are perfect for class treatment and will be easy to prove.

Similarly, Hedge brings breach of contract claims against Defendants under Indiana state law and pursuant to Federal Rule of Civil Procedure 23. Specifically, Defendants breach their contract with Hedge and all similarly situated employees by failing to pay them their agreed upon rates of pay.

## I. FACTUAL ALLEGATIONS

1. Hedge is a resident of the State of Illinois, and is domiciled in Fairfield, Illinois. At all times hereinafter mentioned, Brown was an individual employee who was engaged in commerce or in the production of goods for commerce as required by 29 U.S.C. §207.

2. Hedge and other similarly situated individuals are jointly employed by TMMI and Aerotek.

3. TMMI operates an automobile factory in Princeton, Gibson County, Indiana. TMMI describes itself as follows: "TMMI produces the Toyota Highlander, Sequoia and Sienna. TMMI has been producing the vehicles since 1998 and the total facility size is 4 million square feet. Our manufacturing operations include Stamping, Body Weld, Assembly, Paint, Facilities and Plastics."

4. Aerotek is a staffing agency that works with companies, including Defendant TMMI, that require large volume work forces. Aerotek has employees who work onsite at these companies, including at TMMI's facility in Princeton, Indiana, where Hedge and putative class members work or worked.

5. Defendants employ and employed a staff of hourly-paid production team members, including Plaintiff at TMMI's facility in Princeton, Indiana.

6. On a day-to-day basis, TMMI exercised control over Hedge and similarly situated individuals by dictating the times and manner in which they performed their daily work activities.

7. On a day-to-day basis, Aerotek exercised control over Hedge and similarly situated individuals by supervising their work activities and subjecting them to disciplinary measures for violation of TMMI's polices and procedures as well as for attendance and tardiness.

8. Aerotek retained the right to discharge Hedge and similarly situated employees without notice or cause.

9. Most, if not all, hourly production employees working at TMMI's Princeton, Indiana facility began their employment at the facility through Aerotek. Specifically, Aerotek "hires" employees who are then assigned to work at TMMI. Eventually, these designated Aerotek employees may be "hired" by TMMI. In actuality, there is no practical difference between employees of Aerotek and employees of TMMI. Specifically:

    a. All employees, whether or not they are designated to be an employee of Aerotek or TMMI, work alongside one another on the various assembly lines;

    b. All employees, whether or not they are designated to be an employee of Aerotek or TMMI, report to TMMI supervisors who are designated TMMI employees;

    c. All employees, whether or not they are designated to be an employee of Aerotek or TMMI, use the same time tracking system and are subject to the same unlawful policies requiring them to perform work off-the-clock and for which they are not paid;

    d. All employees, whether or not they are designated to be an employee of Aerotek or TMMI, wear the same uniform.

10. All designated Aerotek employees are given an "Orientation Guide", attached hereto as Exhibit A, which states, among other things:

    a. "Congratulations on becoming and Aerotek team member "Team member". We have created this guide to prepare you for your assignment at Toyota Motor Manufacturing, Indiana, Inc. (TMMI). **You must read, understand, and comply with all provisions of this guide.**" [Orientation Guide, p. 2] (emphasis in original)

    b. TMMI shift times, breaks and lunches, describing Blue Shift and Gold

Shift. [Orientation Guide, p. 2]

   c. The work schedule, determined by TMMI, including holidays and designated shutdown days. [Orientation Guide, p. 2]

   d. "**Indentification Badges**  You will be issued and ID badge that you must carry at all times while on the client premises.  These cards are property of TMMI and must be returned before receiving your **Final Paycheck**. [Orientation Guide, p. 3] (emphasis in original)

   e. **Recording Time Worked** You are responsible for verifying your hours worked at the end of your scheduled work week with your supervisor.  If you arrive to work late you will be docked pay according to the number of minutes late. Changes to your time card can only be approved by your Toyota Supervisor." [Orientation Guide, p. 3] (emphasis in original)

   f. "Each employee is required to wear uniforms provided by Aerotek that are line side approved by TMMI. . . Uniforms must be worn at all times and must be Toyota issued clothing." [Orientation Guide, p. 3] (emphasis in original)

   g. "Aerotek and TMMI are not responsible for loss, theft or damage of personal items." [Orientation Guide, p. 4]

   h. "Lockers are the property of TMMI and are provided for storage of team members' personal items (i.e. clothing, toiletries, etc.) Personal items should be kept inside of lockers.  These lockers are equipped with locks by Security; therefore, personal locks may not be used.  TMMI management will have access to lockers at all times.  In addition, TMMI is not responsible for any damage or theft; however, any loss or damage of property should be reported to Security." [Orientation Guide, p. 4]

   i. "**Jewelry Policy**  To prevent injury to team members and mutilation of vehicles, TMMI has a jewelry policy.  All Team Members, contractors, and visitors are required

to cover or remove their jewelry in production and construction areas. . ." [Orientation Guide, p. 4]

    j.    **"Breaks/Lunch Period** A 45 minute unpaid lunch will be provided. Break times during the 1st and 2nd half of the shift will be at least ten (10) minutes. The exact times of these break periods will be scheduled by the area Group Leader/Supervisor.  A daily communication meeting will be held at the beginning of the shift. A break area is provide for employee to use during scheduled lunches and breaks.  Failure to comply with the TMMI break policy can lead to disciplinary action. [Orientation Guide, p. 5]

    k.    "**Protective equipment**  TMMI will provide personal protection equipment as required for some jobs.  Employees must sign for and properly wear the items while in the assigned working area." [Orientation Guide, p. 5]

    i.    **Company Tools, Equipment and Supplies**  TMMI will furnish all necessary tools, equipment, and supplies to complete job assignments.  When leaving the work area, all tools must be placed back in the designated storage areas or secured in locked storage where available.  TMMI does take periodic inventory of their stock.  **If it is determined that an employee is negligent in the proper storage of tools, equipment, materials or supplies or if they are misplaced or stolen, the employee will be asked to replace the items at a fair market value."** [Orientation Guide, p. 6] (emphasis in original)

    11.    Hedge is a former employee of Defendants.  She was hired on or about May 20, 2018 to work as an hourly-paid employee and worked until the date of her termination on November 30, 2018.

    12.    Defendants paid Hedge and her fellow employees on an hourly-paid basis.

Hedge and her fellow manufacturing employees are non-exempt for FLSA minimum wage and overtime purposes. Hedge and her fellow manufacturing employees routinely work overtime hours (hours in excess of forty) during workweeks through the year.

13. Defendants subjected Hedge and all of their hourly-paid employees to illegal wage deductions, including but not limited to, deductions for the cleaning of PPE and/or Uniforms. Pay stubs will show the total amounts illegally deducted from all employees for each pay period and each year.

14. Hedge is specifically alleging that Defendants have taken illegal deductions in violation of the Indiana Wage Assignment Statute, I.C. 22-2-6-2, and in so doing, Defendants have failed and refused to pay Hedge and each and every other similarly situated employee his/her overtime wages in full in each and every week Defendants took one of these illegal pay roll deductions.

15. All wage deductions Defendants took from Hedge and any other employee's wages during weeks in which the Hedge and similarly situated employees also worked overtime constitutes an FLSA overtime violation for failure to pay all overtime free and clear and not subject to any kickback. This would include all deductions taken from Plaintiffs' wages that would constitute "facilities" and be required by Defendants for the job, which includes deductions for the cost of cleaning uniforms and/or PPE.

16. Defendants required Hedge and all other employees to wear certain PPE that is required by Defendants (and likely by law) in order to perform work in the Princeton, Indiana facility, including but not limited to buffer caps and hard hats, safety gloves, safety glasses, earplugs, protective jumpers and steel-toed shoes.

17. Importantly, Defendants do not record the time it takes for employees to don or

doff this PPE in any way.  Defendants' employees are required to don this PPE in the employee locker rooms before their scheduled shifts.  Prior to every shift, Defendants' require their employees to don their PPE in the locker room, walk to a mandatory pre-shift meeting where they are required to stretch while hearing Toyota's news of the day. Employees are then given their daily job assignments and only then are they allowed to clock-in.  It is only when employees clock-in that Defendants begin tracking employee hours for the purpose of calculating the wages due.  Further, at the end of each shift, Hedge and similarly situated employees are required to immediately clock-out.  Only after clocking out are they allowed to return to the employee locker rooms and begin doffing their required PPE.  At the beginning of Hedge's employment, Defendants required employees to clock-in with a pencil and time sheet. Approximately 6 weeks before Hedge's employment ended, Defendants began using a digital time clock.  However, Defendants' failure to track and pay for all hours worked continued.

18.     As a result of Defendants' refusal to track all compensable hours worked by Hedge and similarly situated employees, Defendants have been systematically underpaying its employees significant sums of agreed upon wages and FLSA required overtime wages on a daily basis.  Many employees, including Hedge, have been underpaid agreed upon wages and overtime compensation by thirty (30) minutes or more per shift.

19.     All of the time within which employees change into required uniforms and PPE, walk and complete donning of PPE and participate in mandatory pre-shift meetings is work time and must be compensated under the law.  Defendants do not and have not paid Hedge and all similarly situated employees for any of this work time from the time of each employee's first principal activity (donning work clothing and PPE) as is required by law.

20.     Hedge and her similarly situated coworkers were required to continue production

work and remain in their required PPE at their work stations until they are notified that their production work for the day is complete. Once they are notified that their shift is over for the day, employees immediately clock-out. Thus, defendants stopped paying wages to employees at this clock-out time, but employees had to spend additional time working before they were able to leave the Princeton, Indiana facility. Employees would have to walk to the employee locker rooms, doff, clean (if necessary) and put away all employees would have to walk back to the locker room, doff and clean (if necessary) their PPE and change clothes (and shower, if necessary). Only after all of this work was performed to the final principal work activity of the day (final doffing of PPE and clothing), could the employee clock out for the day and leave the Princeton, Indiana facility. At the beginning of Hedge's employment, Defendants required employees to clock-in with a pencil and time sheet. Approximately 6 weeks before Hedge's employment ended, Defendants began using a digital time clock. However, Defendants' failure to track and pay for all hours worked continued.

21. Hedge and similarly situated employees work or worked in an automobile manufacturing facility. The work requires significant attention to safety and requires significant, required clothing and safety gear. This substantial don and doffing work and pre-shift meeting occurred each and every shift and Defendants were not and is not paying hourly employees for this required and necessary work time.

22. Defendants intentionally and knowingly violated their employees' rights to earned wages through Defendants illegal time tracking practices and Defendants' conscious and deliberate decision not to pay employees for all work time related to the donning and doffing of PPE and required uniforms and all related work activities which occurred before the official shift scheduled start time and after the official quitting time.

23. During her employment with Defendants, Defendants made unlawful deductions from the pay of Hedge to cover the cost of uniform and/or PPE cleaning. Defendants' routinely make these deductions from the pay of their employees. By way of these deductions, Defendants failed to pay Hedge and similarly situated employees all overtime wages due.

24. Hedge and similarly situated individuals receive performance based, non-discretionary bonuses, shift differentials and wellness credits. However, Defendants fail to include these payments in the calculation of each employee's regular hourly rate, which caused Hedge and other similarly situated employees to receive an overtime rate less than one and one-half times their regular rate.

25. During most calendar weeks throughout her employment, Hedge worked in excess of forty hours and is owed additional overtime compensation based upon Defendants' time tracking practices. In nearly all work weeks, Hedge lost wages as a result of Defendants' unlawful practices. In every work week involving more then forty hours of work, Hedge lost overtime wages as a result of Defendants' unlawful practices. The same is true about overtime and unpaid wages for all of Plaintiffs' similarly situated, hourly-paid coworkers in the period of time covered by this lawsuit – December 2015 to the present.

26. Defendants have intentionally, knowingly, with reckless disregard and systematically violated its employees' rights to earned wages through Defendants uniform and/or PPE cleaning deduction practices, its illegal time tracking practices, and its illegal treatment of required, work time (donning/doffing of PPE, walking to and participating in pre-shift meetings and walking to work stations) as unpaid time. Defendants intentionally, knowingly, with reckless disregard and systematically violated Hedge and all similarly situated employees' rights to be paid earned overtime compensation. Defendants deliberately and intentionally

implemented illegal wage deductions, an illegal time tracking system, and illegal wage policies in order to pay less in wages and overtime to its employees than it owed.

27. Further a contract existed between Defendants and Hedge and all similarly situated employees. For example, Defendants agreed to pay to employees: 1) an overtime rate of (X 1.5) to all hours worked over 8 per day; 2) an overtime rate of (X 1.5) to hours worked on Saturday; and 3) an overtime rate of (X 2.0) to hours worked on Sunday. [Orientation Guide, p. 2]

28. Defendants breached this contract between themselves and Hedge and all others similarly situated. Specifically, Defendants did not pay employees 1) an overtime rate of (X 1.5) for all hours worked over 8 per day; 2) an overtime rate of (X 1.5) for hours worked on Saturday; and 3) an overtime rate of (X 2.0) for hours worked on Sunday.

29. Hedge and other similarly situated employees have been damaged by Defendants' breach. Specifically, Hedge and other similarly situated employees have not been paid the money owed to them in accordance with the contract.

30. Lastly, Defendants failed to pay Hedge any wages for her final week of work with Defendants. For her last week of work, Hedge worked in excess of forty (40) hours. Defendant has withheld Hedge's final paycheck. As a result, Hedge has not been paid the minimum wage and overtime premium required under the FLSA. Defendants' practice and policy of failing to pay Hedge and others similarly situated for their final week of work results in a further violation of the FLSA's overtime and minimum wage provisions.

### III. CLASS AND COLLECTIVE ACTION ALLEGATIONS

31. Hedge incorporates herein by reference paragraphs 1 - 30 above.

32. Hedge is pursuing her claims individually, but this Complaint is brought also as a collective action and as a class action on behalf of other current and former employees of Defendants who were similarly denied payment of wages and overtime compensation under Defendants' compensation scheme that involved unlawful wage deductions failure to pay overtime at the required premium and the failure to pay for all work time from the first principal activity each day through the last principal activity.  This includes unpaid wages and overtime caused by the failure to pay wages for work at the beginning and the end of Defendants' employees' shifts.

33. This action is filed as a collective action pursuant to Section 16(b) of the Fair Labor Standards Act, 29 USC § 216(b), on behalf of Hedge and all Defendants' current and former employees who were damaged by Defendants' compensation system which required and resulted in uncompensated work by Defendants' employees.  By virtue of the "collective action," Hedge represents the identical and/or similar interests of former and current coworkers denied overtime compensation under the same circumstances.  Hedge anticipates that other employees and former employees of Defendants will opt in to the action.

34. With respect to FRCP 23(b)(3) class action claims for breach of contract, Hedge will serve as class representative over a proposed class.  The class will be as follows:

> Hedge will serve as class representative for the class-wide claims brought under Indiana law for a breach of contract.  This Court has supplemental jurisdiction over Hedge's Indiana breach of contract claims.  This action is filed as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of Hedge and on behalf of all eligible current and former employees of Defendants who work or worked for the Defendants and were damaged by Defendants' compensation system which required and resulted in Defendants' failure to pay rates as agreed upon. By virtue of the class action, Hedge represents the identical and/or similar interests of former and current coworkers

denied their agreed upon pay under the same circumstances.

35. Based upon information and belief, the number of potential class members is believed to be several thousand or more individuals, however, the actual number of Defendants current and former employees who will be members of this collective action/class action is so great (numerosity) that joinder of all members is impractical. Instead, Hedge will pursue discovery to obtain the names of the other current and former employees of Defendants, to provide notice of the collective action, and to offer the opt in opportunity, and to provide notice of the class action and to offer the opt out opportunity.

36. Particularly with the types of overtime claims and pay practices at issue in this case, there are questions of law and fact that are common to the entire collective group/class.

37. Hedge's claims are typical of the claims of the whole collective group of Defendants' current and former hourly-paid employees harmed by Defendants' illegal wage practices and breach of contract.

38. Hedge will act to fairly and adequately protect the interests of the entire collective group of current and former employees of Defendants. Hedge will act fairly and adequately protect the interests of the entire Rule 23 class of current and former employees of Defendants.

39. A "combined"[1] collective action/class action is superior to other available means for the fair and efficient prosecution of these wage claims and breach of contract claims against Defendants. For example, to prove Defendants illegal wage practices, Hedge and other members of this collective group/class would seek in discovery records about all similarly situated current and former employees of Defendants who were similarly denied agreed upon pay and and minimum and overtime compensation under Defendants compensation system that resulted in

uncompensated work through illegal time recording practices, unlawful deductions and refusal to pay final paychecks, all of which harmed hourly-paid employees.  Individual lawsuits by the members of the collective group/class could lead to 1) inconsistent or varying outcomes in the cases, 2) duplicitous discovery, or 3) competition for limited funds.  Further, as a practical matter, the first litigant to trial may achieve a result which would have bearing on all of the other individuals in the group.

40. A determination regarding the "similarness" of those able to participate in the collective action/class action would also allow litigation of claims that may not otherwise be cost effective, depending upon the amount of each individual group member's damages.  Particularly with the type of FLSA and Indiana breach of contract claims at issue in this litigation, some, if not most, of the individual group members may not be aware of their rights to their wages under the FLSA and payment under Indiana law, or may not, because of financial means or experience, be in a position to seek the assistance of counsel to commence individual litigation.

41. A combined collective action/class action will result in an orderly and expeditious administration of the group members' claims, and economies of time, court resources, effort and expense, and uniformity of decisions will be assured.

42. Because Defendants' compensation system which required and resulted in illegal wage deductions and uncompensated work by hourly-paid employees results in breach of contract claims and wage violations that trigger issues of both federal and state law, this cause of action presents the ideal factual scenario supporting the Court's exercise over the supplemental state law claims, as common state and federal law issues predominate.

---

[1] See *Ervin v. OS Restaurant Services, Inc.*, 632 F.3d 971, 973-974 (7th Cir. 2011)

### IV. JURISDICTION AND VENUE

43. This Court has jurisdiction over Hedges FLSA claims under 28 USC § 1331 as those FLSA claims raise questions of federal law. See 29 USC § 201 et seq. The Court has supplemental jurisdiction over Defendants' Indiana law claims, which have a common basis in fact with their own and the other Plaintiff class members' FLSA claims.

44. This Court is the appropriate venue for this cause of action as Hedge worked for Defendants at the Toyota facility in Princeton, Gibson County, Indiana and most of the illegal activity took place in the Southern District of Indiana. 28 USC § 1391.

### V. STATEMENT OF CLAIMS

*A. Fair Labor Standards Act Claims (With Hedge as FLSA Collective Action Representatives)*

45. Hedge incorporates herein by reference paragraphs 1 through 44 above.

46. TMMI is an "enterprise," as that term is defined by the FLSA, covered by the overtime and minimum wage provisions of the FLSA. TMMI is an "employer," as that term is defined by the FLSA. TMMI is a "person" as that term is defined by the FLSA. TMMI acted, directly or indirectly, in the interest of an employer with respect to Hedge and other similarly situated employees.

47. Aerotek is an "enterprise," as that term is defined by the FLSA, covered by the overtime and minimum wage provisions of the FLSA. Aerotek is an "employer," as that term is defined by the FLSA. Aerotek is a "person" as that term is defined by the FLSA. Aerotek acted, directly or indirectly, in the interest of an employer with respect to Hedge and other similarly situated employees.

48. At all times hereinafter mentioned, TMMI and Aerotek have been an enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. §203(r). At all times hereinafter

mentioned, TMMI and Aerotek have been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. §203(s)(1), in that the enterprise has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling or otherwise working on goods or materials that have been moved in, or produced for, commerce by any person and in that the enterprise has had and has an annual gross volume of sales made or business done of not less than $500,000.

47. Defendants violated the rights of Hedge and the rights of all members of the Plaintiff Class to be properly paid overtime and minimum wages in a manner required by the FLSA. Defendants have committed overtime violations by failing to pay Hedge and her similarly situated coworkers for all overtime hours of work, particularly as Defendants were taking unlawful deductions (kickbacks) during weeks in which overtime was worked and Defendants underpaid overtime wages based upon their refusal to pay employees from a first principal activity (donning) to a last principal activity (doffing). Defendants further violated the overtime provisions of the FLSA by failing to properly calculate the overtime due Hedge and her similarly situated coworkers. Defendants violated the minimum wage provisions of the FLSA by failing to pay Hedge and her similarly situated coworkers for the final week of work.

48. Defendants have repeatedly violated the FLSA's overtime provisions by not paying Hedge and members of the Plaintiff Class at the required overtime compensation rate for all hours worked over 40 in a work week.

49. Defendants have repeatedly violated the FLSA's minimum wage provisions by not paying Hedge and members of the Plaintiff Class any wages for their final week of work.

50. Defendants' failure to comply with the FLSA's provisions regarding overtime and minimum wage compensation is willful and without justification, and subjects Defendants to a

three year statute of limitations.

51. Hedge and the Plaintiff Class seek all available damages, including unpaid minimum wages, unpaid overtime compensation, liquidated damages, payment of reasonable attorney's fees, costs and expenses, and any and all other damages to which they may be entitled for Defendants' violations of their rights under the Fair Labor Standards Act.

### B. Indiana Breach of Contract Claims (With Hedge as Rule 23 Class Representative)

52. Hedge incorporates herein by reference paragraphs 1 through 51 above.

53. Hedge has a breach of contract claim arising under the Indiana law and she is the named Plaintiff who represents the same or similar interests of all Defendants' current or fomer hourly-paid employees.

54. By way of this Claim, Hedge is seeking, individually and on behalf of members of the Plaintiff Class of current and former hourly paid employees of Defendants all available damages, including all unpaid or underpaid compensation, all attorney's fees, costs and expenses, plus any other damage to which Hedge and her fellow Plaintiff Class members may be entitled pursuant to law. Hedge further expressly asserts and alleges that Defendants breached their contract with Hedge and similarly situated employees by failing to pay compensation at the rates required by their agreement.

### VI. PRAYER FOR RELIEF

WHEREFORE, Hedge respectfully requests that the Court enter judgment against Defendants, and issue all available relief to them and to all eligible members of the Plaintiff Class, including, but not limited to, the following:

1. All damages available under the FLSA, including all unpaid overtime wages, all minimum wages, all liquidated damages, and payment of all reasonable attorney's

       fees, costs and expenses;

2.    All damages resulting from Defendants' breach of contract;

5.    All reasonable attorney's fees and expenses;

6.    Costs;

7.    Prejudgment interest, if available; and

8.    Any and all other relief just and proper in the premises.

       Respectfully submitted,

       /s/Robert J. Hunt
       Robert J. Hunt
       Attorney No. 30686-49
       THE LAW OFFICE OF ROBERT J. HUNT, LLC
       1905 South New Market Street, Ste. 220
       Carmel, IN 46032
       Telephone:  (317) 743-0614
       Facsimile:  (317) 743-0615
       E-Mail: rob@indianawagelaw.com